IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


CONNIE A. O'BRIEN,                                    CV. 09-76 MO


                    Plaintiff,                        OPINION AND ORDER


            v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.


MOSMAN, Judge:

## INTRODUCTION

Plaintiff  Connie O'Brien ("O'Brien"), brings this action pursuant to the Social Security

Act, 42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying her claim for Disability Insurance

Benefits ("DIB"), a period of disability, and Supplement Security Income ("SSI") disability

benefits under Titles II and XVI of the Social Security Act.  For the reasons set forth below, the decision of the Commissioner is affirmed and this matter is dismissed.

## PROCEDURAL BACKGROUND

In January 2005, O'Brien filed applications for disability insurance benefits under Title II of the Act alleging disability since December 20, 2004, due to Bipolar Disorder, migraines, misaligned spine, and hip problems.  Her  application was denied initially and upon reconsideration.  On May 2, 2007, a hearing was held before Administrative Law Judge ("ALJ") Atkins.  A supplemental hearing was held on November 28, 2007.   In a decision dated March 26, 2008, the ALJ found O'Brien not disabled.  O'Brien's request for review was denied, making the ALJ's decision the final decision of the Commissioner.  O'Brien now seeks judicial review of the Commissioner's decision.

## ALJ's DECISION

At step one, the ALJ found O'Brien had not engaged in substantial gainful activity after the alleged disability onset.  This finding is not in dispute.

At step two, the ALJ found O'Brien had the medically determinable severe impairments of pseudoseizures, bipolar disorder/mood disorder, and panic disorder.  This finding is not in dispute.

At step three, the ALJ found that O'Brien's impairments did not meet or medically equal a listed impairment.  This finding is not in dispute.

The ALJ determined that O'Brien retained the residual functional capacity to perform medium work, limiting her to routine, unskilled work with no public contact.  This finding is in dispute.

2  - OPINION AND ORDER

At step four, the ALJ determined that O'Brien was able to perform her past relevant work as a housekeeper. This finding is in dispute.

In the alternative, at step five, the ALJ found that O'Brien was capable of performing other work that exists in the economy, including assembly line worker and laundry worker. This finding is in dispute.

## FACTUAL BACKGROUND

O'Brien was born in 1963, and was 41 years old at the time of the alleged onset of disability. She has a Bachelor's degree in history with additional course work in wildlife biology and education. Tr. 463-64.[1]  O'Brien has past relevant work in retail sales, as a letter carrier/mail handler, alarm center operator, biological technician, care giver, cashier, security dispatcher, housekeeper and park ranger. Tr. 25, 101.

The medical records in this case accurately set out O'Brien's medical history as it relates to her claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

O'Brien contends that the ALJ erred by: (1) improperly rejecting lay witness testimony; (2) finding her not fully credible; (3) improperly rejecting the opinion of a treating physician; (4) failing accurately to describe her residual functional capacity; and (5) relying on an inadequate hypothetical question to the Vocational Expert ("VE").

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

3  - OPINION AND ORDER

I. <u>O'Brien's Argument Regarding Lay Witness Testimony Fails</u>

O'Brien contends that the ALJ erred by failing to provide valid reasons to discredit the unsworn statements, on forms prepared by plaintiff's counsel, of Rhonda Schindler, Debbie Curtis, Bobbi Hanson, and Beverly Wilkinson, citing transcript pages 241-272. Plaintiff does not identify, in either her Opening or Reply Briefs, any specific testimony the ALJ purportedly failed to credit. Accordingly, plaintiff's argument fails.[2]

Moreover, the ALJ properly found that the lay witness observations were inconsistent with the medical evidence. *Bayliss v. Barnhart,* 427 F3d 1211, 1218 (9th Cir 2005).

II. <u>The ALJ Appropriately Assessed Plaintiff's Credibility</u>

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F3d at 724. *See also Holohan v. Massinari,* 246 F3d 1195, 1208 (9th Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan,* 246

---

[2] The second sentence of Plaintiff's Opening Brief is "A reversal of the Commissioner's decision is mandated herein because it is not supported by substantial evidence and contains errors to her job with the post office she worked for the national park service intermittently since 1995 of law as set forth below." Plaintiff's Opening Brief, p. 3. Counsel is advised to proof read more carefully.

F3d at 1208.  The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F3d 947, 958 (9th Cir 2002).

O'Brien contends that the ALJ gave too much weight to the opinion of John Givi, Ph.D., Psy. D., that there is the "possibility of an invalidating response set," and not enough weight to the possibility of "serious psychopathology."  The ALJ noted Dr. Givi's opinion in full, and that Dr. Givi had concluded that O'Brien retained a GAF rating of 64 and only mild functional limitations.  O'Brien points to the July 2006 opinion of treating physician Gregory M. Knopf, M.D.,  that O'Brien had a GAF rating of 45, and contends that the ALJ failed to explain why he gave more weight to Dr. Givi than he did to Dr. Knopf.

The ALJ found "the claimant's medically determinable impairments (pseudoseizures, bi-polar or mood disorder, and panic disorder) could reasonably be expected to produce some of the symptoms she described.  However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  Tr. 21.

The ALJ stated that, as to O'Brien's alleged migraines and light sensitivity, there was no medical diagnosis and the alleged symptoms had not been present for a continuous period of twelve months.  *Id.* The ALJ cited the emergency room records of November 5, 2004, in which the examining physician attributed her symptoms to a viral syndrome.  Tr. 21, 283-90.  The ALJ said that the claimant had thereafter been irregularly prescribed medications for headaches based only on her history, citing Tr. 292-98.  Those records indicate that O'Brien was treated on November 19, 2004, reported a history of migraines, and believed that a migraine was coming.  She was given medication samples.  Tr. 298.  She was seen on November 27, 2004, for a

conversion reaction (uncontrollable shaking), which resolved within an hour after an injection of Diazepam. Tr. 297. The claimant was treated on December 1, 2004, for another conversion reaction. Tr. 296. Philip I. McDaniel, M.D., noted that O'Brien had not taken her prescribed Xanax, and that she stopped shaking about an hour and a half after taking it. She was seen on December 10, 2004, to follow up. Tr. 295.

The ALJ noted that in a June 2005 consulting examination, O'Brien reported that she suffered migraine headaches two to three times per month which lasted several days "unless she uses medications. Relpax helps dramatically. She has almost daily tension headaches." Tr. 329. The ALJ stated that "her alleged headaches were treatable and adequately responded to medications." Tr. 21. The ALJ noted that O'Brien was treated in the emergency room for a migraine on August 10, 2005. Tr. 356-57. She asked for pain medication, and reported that Zomig and Phenergan usually worked. She was given Phenergan, and her headache "completely resolved." She was prescribed Oxicodone. The ALJ concluded that this "pattern of visits does not sustain a claim for severe headaches because she has sought treatment irregularly; there are no objective findings; and the headaches respond to treatment." Tr. 21.

As to the claimant's assertion of back pain, the ALJ noted a chiropractor's report from April 2004, in which treatment for cervical and lumbar subluxation is recommended. O'Brien apparently did not pursue this treatment. The ALJ cited the June 2005 examination by Kim Webster, M.D., in which Dr. Webster found a normal neuromuscular examination, "several positive Waddell signs," and inconsistency on the straight leg raise, indicating a non organic cause of any back pain. Tr. 22., 330. The ALJ cited Dr. Knopf's May 9, 2006 note in which he

reported "spinal manipulation with excellent results." Tr. 22, 420. The ALJ correctly notes that there is no evidence of further treatment for back pain.

In May 2007 O'Brien testified before the AJL that she has chronic bilateral wrist tendonitis, and that there are "days I can't even pick up a coffee cup or a tea mug." Tr. 485. The ALJ cited normal x-rays in August and September 2003. Tr. 22, 312-13. A November 2003 examination of her wrists revealed no redness or swelling and a normal range of motion without discomfort. Tr. 22, 311. O'Brien argues that she was treated for bilateral wrist tendinitis from May 2002 to March 2004. However, this is not relevant as her alleged onset date of disability is December 2004, and O'Brien cites no evidence of treatment for tendinitis after March 2004.

O'Brien testified before the ALJ that she has post traumatic stress disorder ("PTSD"). Tr. 468. The ALJ noted that no medical provider had diagnosed PTSD, and that Dr. McDaniel found that O'Brien's bipolar disorder was not well controlled and that she had not been compliant with instructions to take Xanax. Tr. 22, 295-96.

The ALJ cited Dr. McDaniel's October 2005 recommendation to exercise daily as that should help her depression and anxiety as much as the medications. Tr. 23, 417. The ALJ noted that there was no evidence that O'Brien was compliant with this advice until May 2006, when she was volunteering at a horse therapy barn. Tr. 23, 420.

The ALJ noted the Comprehensive Psychological Examination conducted by Dr. Givi on July 3, 2007. Dr. Givi administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and stated that "this client scored in such a manner that the possibility of an invalidating response set should be considered. She may have demonstrated a true response bias in responding to the items; however, similar scorers can also be seen as conveying very serious

psychopathology." Tr. 23, 434.  The ALJ considered that Dr. Givi concluded that O'Brien had

major depressive disorder, assessed her GAF at 64, and identified only mild functional

restrictions.

The ALJ noted the June 2005 report by Molly C. McKenna, Ph.D., who administered a

Comprehensive Psychological Examination.  Tr. 23, 331-335.  Dr. McKenna said that the

claimant had a notable tremor in the right hand, which seemed to stop when she focused

intensely on providing a specific answer.

Finally, the ALJ stated that the claimant had answered appropriately at her hearing until

he attempted to question her about inconsistencies between her activities of daily living and her

testimony that she is often confined to her room.  At that point O'Brien appeared to suffer a

pseudoseizure, her torso began shaking and she stopped talking.  She pulled a pill out from her

purse and used her water bottle.  She then "said that she had '17 of these episodes' in one day

when she was denied benefits at the state public assistance office."  Tr. 23.

The ALJ found inconsistencies in plaintiff's reports.  He noted that O'Brien told Dr.

McKenna that she was fired from J.C. Penny's in December 2004 for violating company policy,

but later stated that she was fired for her health problems.  Tr. 23, 332.

The ALJ did not err in finding O'Brien less than fully credible as to her symptoms.  The

ALJ's credibility determination is supported by substantial evidence.

III.  The ALJ Properly Weighed Dr. Knopf's Opinion

Dr. Knopf was the claimant's treating physician from February 2006 through at least July

2006.  Dr. Knopf saw O'Brien on February 14, 2006, to establish care.  Tr. 421.  He saw her

again on May 9, 2006, for complaints of headache and neck pain, and prescribed Relpax.  Tr.

420.  He noted that her mood was generally good, that she was sleeping better with Seroquel, and volunteering at the horse therapy barn.  He performed spinal manipulation with "excellent results."  *Id.*

On July 18, 2006, Dr. Knopf saw O'Brien "for disability evaluation," noted that she was volunteering at a therapeutic horse barn, and that she was able to control her pseudoseizures when she was around children.  Tr. 418.  She reported having had five pseudoseizures, and ongoing left knee pain without locking.  Her headaches were controlled by Relpax.  Dr. Knopf noted that O'Brien's pseudoseizures were "controlled with current medication most of the time," and "I believe that she could do some type of low stress work in the right circumstances."  *Id.*  Dr. Knopf filled out a form provided by counsel in which he asserted that he had known O'Brien for five months, and that her DSM-IV multiaxial evaluations were Bipolar Disorder, migraine headaches, and pseudoseizures.  He assessed her current GAF as 45.  Tr. 372.  Dr. Knopf checked off 33 out of 54 listed "signs and symptoms."  Tr. 373.  When asked to describe the clinical findings which demonstrate the severity of the patient's mental impairments and symptoms, Dr. Knopf responded "MMSE[3] 30/30 = perfect score," which actually indicates normal mental functioning.  Tr. 374.  Dr. Knopf checked the box indicating that he would expect O'Brien's impairments would cause her to be absent from work more than four times a month.  Tr. 376.

---

[3] The mini-mental state examination ("MMSE") is a brief 30 point questionnaire used to screen for cognitive impairment, commonly used to screen for dementia.  It includes simple questions and problems in a number of areas including the time and place of the test, repeating lists of words, arithmetic such as the serial sevens, language use and comprehension, and basic motor skills like copying a drawing of a geometric figure.  Any score greater than or equal to 25 out of 30 is effectively normal.

The ALJ properly noted the use of the fill-in-the-blanks form, and that Dr. Knopf had not treated the claimant for a long period of time. The ALJ noted that Dr. Knopf had seen the claimant only twice before filling out the form at issue, and that he had not seen the claimant long enough to make an assessment covering the entire period of time at issue. Dr. Knopf did not explain what supported his assertion that O'Brien had been unable to work since December 2004. The ALJ stated that there was no objective basis for Knopf's assertion that O'Brien had "marked" difficulties in social functioning; "constant" deficiencies of concentration, persistence and pace; or "repeated (three or more times)" episodes of decompensation. Tr. 24. "For all the above reasons, [Knopf's] responses to questions about the severity of the claimant's condition...work-related limitations...a GAF of 45, and the degree of functional limitations are not given any weight [citation omitted]." *Id.*

The ALJ is responsible for determining credibility and resolving conflicts in the medical testimony. *Magallanes v. Bowen,* 881 F2d 747, 750 (9th Cir 1989). Contradictions between a doctor's assessment of a claimant's abilities and that doctor's clinical notes, observations, and opinions of the claimant's capabilities "is a clear and convincing reason for not relying on the doctor's opinion[.] *Bayliss v. Barnhart,* 427 F3d 1211, 1216 (9th Cir 2005).

The ALJ properly identified clear and convincing reasons to give little weight to the opinions expressed by Dr. Knopf on the questionnaire.

IV. The ALJ's RFC Finding Is Supported By Substantial Evidence

The ALJ found O'Brien retained the capacity for medium exertion work, limited to unskilled, routine work, with no public contact. Tr. 25. The ALJ noted the opinion of examining physician Dr. Webster, who found O'Brien had a normal neuromuscular examination, positive

Waddell signs, and inconsistency on straight leg raise.  Tr. 22, 327-30.  Dr. Webster stated that she found no objective evidence that would limit plaintiff's ability to sit, stand, walk, lift, or carry, and no evidence to support postural, manipulative, or environmental restrictions.  Tr. 24, 330.  Despite Dr. Webster's opinion, the ALJ limited plaintiff to medium extertion work due to her obesity.  Tr. 24.

O'Brien argues that the ALJ failed to include limitations arising from headaches. However, the ALJ properly found that the headaches are controlled by medication and to the extent that O'Brien asserts they are disabling, she is not credible.

O'Brien argues that the ALJ failed to include limitations arising from tendonitis.  The ALJ properly found that there was no objective evidence of tendonitis since the alleged onset of disability, and that O'Brien's assertions to the contrary were not credible.

O'Brien argues that the ALJ failed to consider all of the functional limitations arising from her pseudoseizures, bipolar disorder, and panic disorder.  She contends that "all of these impairments will interfere with an ability to perform work activities consistently and repeatedly." Plaintiff's Opening Brief, p. 22.  As set out above, the ALJ properly limited the plaintiff to unskilled, routine work with no public contact to accommodate all of the functional limitations supported by credible objective evidence.

O'Brien argues that the ALJ improperly failed to include in the RFC analysis medication side effects identified by Dr. Knopf to include drowsiness, fatigue, and confusion.  As set out above, the ALJ properly gave little weight to Dr. Knopf's opinion.

/ / /

/ / /

11  - OPINION AND ORDER

V.  <u>The ALJ Properly Relied Upon the Vocational Expert's Testimony</u>

O'Brien contends that the ALJ erred in relying upon the vocational expert's testimony because the hypothetical upon which the vocational expert relied did not reflect her residual functional capacity.  This argument fails for all of the reasons set out above.

The ALJ's step four and  five determinations are supported by substantial evidence.

<u>**CONCLUSION**</u>

For these reasons, the ALJ's decision that O'Brien is not entitled to disability insurance benefits or supplemental security income under Titles II and XVI of the Social Security Act is based on correct legal standards and supported by substantial evidence.   The decision of the Commissioner is affirmed and this case is dismissed.

IT IS SO ORDERED.

Dated this  _12th_  day of April, 2010.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

12  - OPINION AND ORDER